UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TRACEY LAVON McWHORTER,

                          Plaintiff,             Civil Action No. 2:17-CV-12062
                                              Honorable Paul D. Borman
        v.                          Magistrate Judge David R. Grand

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                          Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]

Plaintiff Tracey Lavon McWhorter ("McWhorter") brings this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [16, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Roberts is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [18] be GRANTED, McWhorter's motion [16] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On May 9, 2014, McWhorter filed a Title XVI application for SSI, alleging disability as of January 6, 2008.  (Tr. 15).  On May 13, 2014, McWhorter filed a Title II application for DIB, also alleging a disability onset date of January 6, 2008.  (*Id.*).  The claim was denied initially on July 25, 2014.  (*Id.*).  Thereafter, McWhorter filed a timely request for an administrative hearing, which was held on November 23, 2015, before ALJ Patricia McKay.  McWhorter, represented by counsel, testified at the hearing, as did vocational expert ("VE") Pauline Pegram.  In a written decision dated April 14, 2016, the ALJ found McWhorter not disabled.  (Tr. 26).  On April 25, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner for purposes of this review.  (Tr. 1).  McWhorter filed for judicial review of the final decision on June 24, 2017.

B.    **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

## C.   Background

### 1.   *Plaintiff's Testimony and Subjective Reports*

McWhorter alleges disability resulting from congestive heart failure, coronary artery disease, bilateral knee injuries, obesity, hypertension, pulmonary artery disease, and cystic kidney disease.  (Tr. 229).  At her hearing, McWhorter, age 44, testified regarding her chronic chest pain, chronic heart failure, hypertension, abdominal pain, back pain, knee pain, anxiety, shortness of breath, leg & feet swelling, sleep apnea, and slipped discs.  (Tr. 87-88).  She explained her ongoing treatment for such conditions, including a stent placement in her right coronary artery, and multiple screws in both knees.  She also testified about the symptoms and

effects of her medications, including shortness of breath, dizziness, retaining fluid, drowsiness and fatigue, extremity swelling, chest pain, and heart palpitations.  (Tr. 93-95).

In her 2014 Function Report, McWhorter indicated her chronic back pain and congestive heart failure left her unable to stand for more than an hour or sit for more than two hours without swelling.  (Tr. 180).  She began using either a cane or a prescribed walker in 2013. (Tr. 66, 186).  She indicated that she only left her apartment about twice per month, and testified that she does not "go out at all basically" (Tr. 62) except for doctor's appointments or the occasional grocery store visit.  (Tr. 183, 184).  She had not driven in three years.  (Tr. 183, 64).  Even showering, or "just walking to the bathroom," caused her to feel out of breath.  (Tr. 64).

### 2.    *Medical Evidence*

The Court has thoroughly reviewed the voluminous transcript in this matter, including the medical opinion evidence, and McWhorter's medical treatment records, Function and Disability Reports, and testimony as to her conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### 3.    *Vocational Expert's Testimony*

Pauline Pegram testified as an independent VE at the administrative hearing.  (Tr. 74-80).  The ALJ asked VE Pegram questions regarding unskilled jobs that exist for a hypothetical person of McWhorter's age, education, and work experience who would be limited to light work, in a low stress environment where she controls the pace of the work, with no past relevant work to consider.  (Tr. 75, 76).  The VE testified there were some unskilled light occupations that would fit the hypothetical, including hand packager, hand assembler, testers/inspectors.  (Tr. 76).  The VE further testified there were some examples of unskilled sedentary work to consider, such as

receptionist, information clerks, inspectors, address clerks, and document preparation clerks. (*Id.*).

Next, the ALJ asked the VE to imagine that the same hypothetical person suffered from fatigue and would need breaks during the workday.  (Tr. 78).  The VE testified that she was "not aware of any employer that would tolerate 15 minute [breaks] every hour."  (Tr. 78).  In response to the ALJ's reference to a hypothetical person's need for absences from work for medical treatment, the VE testified that "no more than one day per month on a recurrent basis" would be tolerated by employers.  (Tr. 79).  The VE further testified that "the need to elevate one's extremities, lower extremities, to above heart is, in my experience, preclusive."  (*Id.*).  In response to the ALJ's inquiry as to whether there are any jobs the VE could place such a hypothetical person into, the VE replied, "no" due to the need for leg elevation, difficulty carrying out activity, shortness of breath, and absenteeism.  (*Id.*).  The VE testified that her testimony was consistent with and based on the Dictionary of Occupational Titles.  (Tr. 80).

### D.     The ALJ's Findings

At Step One of the five-step analysis, the ALJ found that McWhorter has not engaged in substantial gainful activity since January 6, 2008, the alleged onset date. (Tr. 18).  At Step Two, the ALJ found McWhorter has the following severe impairments: history of coronary artery disease, chronic heart failure, cardiomegaly, and hypertension status post stent placement, bilateral degenerative joint disease of the knees with history of right knee surgery with screws and left knee status post patellar realignment osteotomy, obesity with history of gastric band surgery, degenerative disc disease of the lumbar spine and right foot compartment syndrome. (*Id.*).  The ALJ considered McWhorter's mental impairments of adjustment disorder and depression to be non-severe based on analysis of four functional areas: daily living, social

functioning, concentration, and decompensation. (Tr. 19). At Step Three, the ALJ found McWhorter's impairments do not meet the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (Tr. 20).

The ALJ found that McWhorter has the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) with the following limitations: she is limited to occasionally climbing stairs, crouching, crawling, kneeling, stooping, or bending, and must avoid workplace hazards such as dangerous moving machinery and unprotected heights. (Tr. 21). The ALJ further found that McWhorter is unable to climb ladders, ropes or scaffolding. Additionally, the ALJ limited McWhorter to low stress, self-paced work. (*Id.*). At Step Four, the ALJ determined McWhorter had no past relevant work. (Tr. 25). At Step Five, the ALJ determined that McWhorter is capable of performing the jobs of receptionist/information clerk (25,000 jobs in the national economy), inspector/tester/sorter (20,000 jobs), addressing clerk (22,000 jobs), and document preparation clerk (37,000 jobs). (Tr. 25-26). As a result, the ALJ concluded that McWhorter is not disabled under the Act. (Tr. 26).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

omitted).

### F.    Analysis

In her summary judgment motion, McWhorter argues:  (1) the ALJ erred in determining that her frequent medical treatment visits are not work preclusive; and (2) the ALJ's decision violates the treating physician rule by failing to afford her treating doctor's opinion controlling weight, and failing to give "good reasons" for such decision.  (Doc. #16 at 16).

*1.    Substantial Evidence Supports the ALJ's Finding that McWhorter's Frequent Medical Treatment Visits Do Not Preclude Employment*

The record in this case shows that McWhorter frequently visited the emergency room and hospitals during the relevant period.  Just prior to the administrative hearing, McWhorter's counsel submitted a letter for the ALJ's consideration which listed 27 "emergency room visits" between May 8, 2014 and July 20, 2015. (Tr. 238-42).  After the administrative hearing, McWhorter's counsel submitted another chart of her "hospitalizations," listing another 53 "emergency room visits" that took place between March 14, 2007 and January 5, 2012.  (Tr. 250-51).  Thus, these documents show, and the record confirms, that from 2007 to 2015, in addition to her regularly-scheduled doctor's appointments, McWhorter sometimes had periods of time when she visited a hospital more than one day per month.  (*Id.*).

For instance, during 2011, McWhorter was at the ER for one reason or another on 29 different days, which means on average, she visited the ER about 2.42 days per month that year. (Tr. 252).  In May 2014, she was admitted to the hospital on four separate occasions: May 8, May 10, May 14, and May 24.  (Tr. 241).  In July 2015, she spent 13 total days in the hospital. (*Id.*).  Citing the VE testimony that employers would not tolerate, on an ongoing basis, more than one absence per month, McWhorter argues, "[t]he ALJ erroneously dismissed [her] frequent hospital visits as irrelevant to her ability to perform work in the national economy . . ."  (Doc.

#16 at 10).  McWhorter claims that, "[a]s even a cursory examination of the record in this case will indicate, plaintiff's hospital visits and occasional admissions would exceed this number and preclude her from competitive employment." (*Id.*).  However, as the following discussion from the ALJ's decision shows, she performed much more than a "cursory" examination of the record, and reasonably supported her decision to reject McWhorter's claim that "the sheer number of her visits to the emergency room in various hospitals would preclude her engagement in employment" (*id.*):

> . . . [McWhorter's] representative argued [in a written brief] that [she] has had a [sic] numerous emergency room visits and inpatient hospital stays from her alleged onset date through 2015.  []  However, [McWhorter's] representative did not relate any of the hospital visits to specifically medically determined impairments and functional limitations that would prevent [her] from performing work activity at the sedentary exertional level.  As [McWhorter] testified, many of these visits became necessary because [she] ran out of her medications.  Some of [McWhorter's] hospital visits for chest pains reflect what attending physicians described as atypical or non-cardiac related chest pain [].  Other visits involved several complaints for toothache, a motor vehicle accident, abdominal pain, and urinary tract infection [].  In an emergency room visit involving a toothache in 2011, the attending physician noted [McWhorter] had been there multiple times requesting narcotic pain medication [].  He reviewed the Michigan Automated Prescription System and found it concerning that in the month of March she received over 200 tablets of Tylenol #3 or Vicodin from six different physicians and on one day, she filled prescriptions at two different pharmacies for these drugs.  []  He explained that he did not feel comfortable prescribing any further narcotic pain medication and recommended that she follow up with a dentist.  []  A September 2011 discharge diagnosis characterized [McWhorter's] abdominal pain as "likely to [sic] secondary to malingering. []  Thus, the undersigned is not persuaded by the argument that the sheer volume of [McWhorter's] treatment is work preclusive.

(Tr. 22-23) (internal citations omitted).

In arguing that the ALJ did not err, the Commissioner quotes *Griffin v. Comm'r of Soc. Sec.*, No. 2:15-CV-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017), for its holding that "[a]bsenteeism due to the frequency of treatment is a relevant factor so long as the treatment

is medically necessary and concerns the conditions on which the disability claim is founded."
(Doc. #18 at 7).  Thus, the "sheer number" of McWhorter's medical visits alone does not
establish her claim for disability.  After reviewing McWhorter's medical records from 2008-
2015, the Court finds substantial evidence supports the ALJ's reasoning as to why McWhorter's
frequent medical visits are not work preclusive.

McWhorter does not contest the ALJ's assertion that her "representative did not relate
any of the hospital visits to specifically medically determined impairments and functional
limitations that would prevent [her] from performing work activity at the sedentary exertional
level."  Instead, McWhorter argues, "Of course, what is dispositive is whether that connection
was made in the record, rather than in the brief, and that connection was established as shall be
demonstrated below."  (Doc. #16 at 11).  But McWhorter failed to make this connection.  After
recognizing that the ALJ "noted that some visits were because [McWhorter] ran out of
medication," McWhorter argues, "However, whether [she] has to go to a doctor's appointment or
a hospital emergency room to get refills, she would still miss work."  (*Id.*).  While McWhorter
testified that she did this because she could not afford her medications (Tr.  71), she fails to
explain why this would require her to visit an emergency room in a manner that conflicted with a
routine work schedule.

McWhorter's argument also ignores the ALJ's finding that many of her visits involved
isolated incidents, not chronic conditions that would require ongoing treatment.  For example,
the ALJ noted that many of her visits were for issues such as "complaints for toothache, a motor
vehicle accident, abdominal pain, and urinary tract infection."  (Tr. 22).  The ALJ's finding in
this regard is consistent with the record.  For example, McWhorter visited the hospital because of
toothaches on April 17, 2011, August 7, 2013, April 2, 2014, and May 10, 2014.  (Tr. 1559, 550,

10

661-62, 682-83, 698).   She also often sought medical attention following four different car accidents in August 2010, September 2013, October 2014, and May 2015.  (Tr. 1615, 1617, 636, 861, 872, 929). She visited the hospital at least five different times complaining of atypical abdominal pain.  (Tr. 1490, 1293, 807, 909, 813).

Many of the other records on which McWhorter relies relate to similar non-chronic issues.  For instance, in April 2013, she first visited the hospital because of dizziness after donating plasma (Tr. 338) and again, due to pain after being kicked.  (Tr. 343).  She sought emergency medical treatment on two different dates during September 2014 because she dropped a TV on her foot while moving it.  (Tr. 838, 848).  On May 23, 2014, she sought emergency medical attention due to a skin abscess emerging after she thought "she may have been bitten." (Tr. 793).   She presented to the emergency room multiple times during September 2015 following an assault (Tr. 842, 879, 882).  She also repeatedly visited the emergency department after falls.  (Tr. 273, 1470, 1586, 1597, 1614, 1645).   On May 22, 2015, she visited the emergency department for back pain after a fall.  (Tr. 901).  Later that month, she again returned to the hospital because of both back and knee pain.  (Tr. 861).  She returned to the hospital yet again due to back pain after another fall in June 2015.  (Tr. 824).  The examining doctor wrote, "She is here frequently in the emergency department for back pain after she falls."  (Tr. 828). She returned to the hospital on October 12, 2015 after "she tripped over a wire," and complained of right foot pain.  (Tr. 876).

The ALJ also noted McWhorter's noncompliance with medications likely triggered at least some of her hospital visits.  (Tr. 22).  The ALJ cited numerous hospital records reflecting that McWhorter had not been taking her medications regularly.  (Tr. 292, 312, 321, 525, 677, 704).  This was a legitimate consideration because the Sixth Circuit "recognizes that a claimant's

failure to follow prescribed treatment is evidence supporting an ALJ's factual finding that the claimant's testimony was not fully credible," which is essentially what the ALJ did here in determining that many of McWhorter's emergency room visits were not medically necessary. *See Lemle v. Comm'r of Soc. Sec.*, 2012 WL 1060111, at *9 (E.D. Mich. Jan. 27, 2012).

The ALJ also cited medical records in which physicians indicated their beliefs that McWhorter was visiting the emergency room not to obtain "medically necessary" treatment, but to improperly obtain narcotics.  (Tr. 22 ("In an emergency visit involving a toothache in April 2011, the attending physician noted [McWhorter had been there multiple times requesting narcotic pain medication.") (citing Tr. 1561)[1], Tr. 23 ("Her attending physician advised her that the emergency department was not the place to manage chronic pain and informed her that she would not receive further narcotics for this issue.") (citing Tr. 890) ).  Similarly, the ALJ cited a discharge diagnosis describing McWhorter's abdominal pain as "likely secondary to malingering." (*Id.*).  Additionally, a discharge summary from a hospital visit for knee and back pain reported: "the patient was upset because no narcotics were prescribed on the day of discharge."   (Tr. 863).   These records all provide substantial evidence for the ALJ's determination that the sheer number of hospital visits by McWhorter during the relevant period does not preclude her from working.

The Court recognizes that many of McWhorter's hospital visits over the years did relate to her cardiac issues, chest pain, lower extremity edema, hypertension, and compartment syndrome.  (*E.g.*, Tr. 685, 690, 818, 821, 831, 857, 862, 989).  However, the fact that she sought

---

[1] In this April 17, 2011 emergency room record, the attending physician noted that "in the month of March [2011], [McWhorter] has received more than 200 Tylenol No. 3 or Vicodin from six different physicians.   I also note that on March 16, she filled prescriptions at 2 different pharmacies for Tylenol No. 3 and Vicodin.  I have explained to her that I personally do not feel comfortable providing her with any further narcotic pain medication . . ." (*Id.*).

ongoing medical treatment for these impairments does not mean the ALJ's determination is not supported by substantial evidence. The ALJ analyzed McWhorter's condition over a seven-year period of time. Certainly, one would expect a person with McWhorter's health issues to seek medical treatment for such impairments from time to time during such a lengthy timeframe; but, as the full record shows, McWhorter's past treatment schedule does not indicate that she would necessarily miss more than one day of work per month for medically necessary appointments.

In sum, while McWhorter's medical records do show frequent hospital visits, substantial evidence supports the ALJ's finding that the sheer number of those visits does not preclude her from working.

   2.   *The ALJ's Decision Does Not Violate the Treating Physician Rule*

"Generally, the opinions of treating physicians are given substantial, if not controlling, deference," but they "are only given such deference when supported by objective medical evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)). Thus, an ALJ "'must give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). *See also Blakley*, 581 F.3d at 406 (internal quotations omitted); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the

13

treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at \*9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014)), *report and recommendation adopted*, 2016 WL 1357900, at \*6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242). That a treating physician's opinion is inconsistent with the record constitutes a "good reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

In October 2015, Dr. Keith Johnstone, McWhorter's treating cardiologist since 2007, completed a Cardiac Medical Source Statement in which he imposed extreme restrictions on McWhorter's functional abilities. (Tr. 789-92). Dr. Johnstone indicated having had frequent

contact with McWhorter, "at least 3-4 times a week [] from Jan. 2008 to present," and diagnosed her with hypertension, CHF, CAD and sinis tachycardic, explaining that clinical findings and test results show "she has an enlarged heart from severe hypertension."  (Tr. 789).  He identified chest pain, loss of appetite, angina equivalent pain, exercise intolerance, chronic fatigue, exertional dyspnea, and palpitations, among others, as relevant symptoms. (*Id.*).   He also indicated that McWhorter suffers angina episodes twice a week, requiring 3-4 hours per rest after each episode.  (Tr. 790).  Dr. Johnstone found that McWhorter can sit less than two hours and stand/walk less than two hours during an eight hour workday, and that she would need to be able to take unscheduled hourly breaks during which she would have to rest for, on average, a half hour.  (Tr. 790-91).  She would need to lie down during these breaks, and elevate her legs above her heart for at least 90% of the workday, due to the swelling that accumulates in her legs and feet.  (*Id.*).  Dr. Johnstone found that McWhorter's symptoms would interfere with her attention and concentration, causing her to be "off task" 25% or more of the day even with respect to simple work tasks.  (Tr. 792).  Ultimately, Dr. Johnstone concluded McWhorter was "incapable of even 'low stress' work" due to her hypertension and anxiety. (Tr. 790).

The ALJ declined to give Dr. Johnstone's opinions controlling weight, explaining that his "opinions were not consistent with his treatment records, which do not reflect such severe limitations."  (Tr. 24).  In her motion for summary judgment, McWhorter argues that the ALJ violated the treating physician rule because she "did not set forth precisely what in the treatment records contradicted the doctor's limitations."  (Doc. #16 at 17).  While the ALJ should have more explicitly linked her decision not to give controlling weight to Dr. Johnstone's opinion with the record evidence, for two reasons the Court disagrees that remand is warranted.  First, elsewhere in the ALJ's decision, she detailed a wealth of medical evidence which was clearly

inconsistent with Dr. Johnstone's opinions.  Second, McWhorter failed to identify a single

treatment record authored by Dr. Johnstone (or any other physician, for that matter) that reflects

the severe limitations he imposed in his opinion, and the ALJ's finding as to that matter is

supported by substantial evidence in the record.

    *a.  The ALJ's Discussion of the Medical Evidence Belies Dr. Johnstone's Opinions*

In this case, it is true, as McWhorter contends, that in discussing her decision not to give

controlling weight to Dr. Johnstone's opinion, the ALJ "did not set forth precisely what in the

treatment records contradicted the doctor's limitations."  (Doc. #16 at 17).  But earlier in her

decision, the ALJ set forth in detail her analysis of objective medical evidence relating to the

issues considered in Dr. Johnstone's opinions; specifically, medical records concerning

McWhorter's cardiac conditions, her feet swelling, compartment syndrome, degenerative disc

disease, and mental impairments.  (Tr. 18-24).  As discussed below, the ALJ's discussion of

these records makes clear the inconsistency between the medical evidence as a whole and the

extreme functional limitations imposed by Dr. Johnstone.

    *i.   Cardiac Conditions*

The ALJ discussed numerous records related to McWhorter's cardiac condition which are

at odds with Dr. Johnstone's opinion:

> February and June 2013 echocardiograms demonstrated a normal 60%
> ejection fraction, trace pulmonic insufficiency, trace mitral regurgitation,
> and pericardial effusion with no evidence of cardiac tamponade.  [] An April
> 2013 stress echo and ECG revealed 'no indicators of ischemia.'  [] A June
> 2013 electrocardiogram showed normal sinus rhythm, left atrial
> enlargement, a mild AV block, otherwise normal with left axis.  [] A heart
> catherization in July 2013 demonstrated "non-significant coronary disease
> and preserved left ventricular function."  []  An October 2013 stress
> myocardial perfusion scan demonstrated no evidence of ischemia or infarct
> and, [sic] normal left ventricular size and systolic function, and a 59%
> ejection fraction.  []  An April 2014 echocardiogram demonstrated an
> ejection fraction of 68%.  The claimant's 2014 cardiac evaluation was

> normal, stress test negative for ischemia and cardiac catherization showed
> normal coronary arteries.  []  In June 2015, the claimant's ejection fraction
> was estimated at 55% but her mid RCA had 90% stenosis and, after a stent
> was placed, she was discharged in stable condition.

(Tr. 23)[2] (internal citations omitted).  None of the records referenced by the ALJ contain any of

the extreme limitations imposed by Dr. Johnstone.  To the contrary, as the ALJ found, they

reflect objective medical evidence demonstrating effective management of McWhorter's cardiac

conditions.  (Tr. 25).  Other records cited by the ALJ during her broader discussion of

McWhorter's impairments confirm that doctors recommended exercise to McWhorter, not

physical immobility, to help manage her heart conditions: Dr. Hachey "[d]iscussed exercised and

dietary modifications with patient" on February 16, 2014  (Tr. 679); an information sheet about

congestive heart failure given to McWhorter on August 17, 2013 states: "Congestive Heart

Failure can be controlled if these suggestions are followed closely: Exercise is recommended, but

do it gradually.  Walking is great exercise. . . ."  (Tr. 579).  Dr. Justin Spaulding "[e]ncouraged

[McWhorter] to eat healthy and exercise on a regular basis" during a hospital visit related to her

congestive heart failure.  (Tr. 691).  And, at a November 28, 2010 hospital visit due to a fall,

McWhorter was advised to "keep moving as much as possible."  (Tr. 1598).

> ii.  *Lower Extremity Edema*

The ALJ also discussed in detail records pertaining to McWhorter's lower extremity

edema, all of which also belie the extreme limitations imposed by Dr. Johnstone.  For instance,

the ALJ explained:

---

[2] The ALJ also provided a thorough explanation as to why she did found McWhorter's
hypertension did not satisfy Listing 4.00H, noting "there are no outward symptoms reflected in
the medical record and no indication that the claimant has suffered any neither end organ damage
nor evidence of any impairment in the body system of the heart, brain, kidney, or eyes because of
hypertension, rising to listing level severity."  (Tr. 20).  McWhorter does not challenge this
finding by the ALJ.

> On May 23, 2014 [McWhorter] presented to the emergency department complaining of leg pain due to abscesses and thought 'she may have been bitten.' []  She was able to move all extremities freely with no lateralizing weakness of the upper or lower extremities. []   In November 2014, [McWhorter] had an arthroscopy with osteotomy and screws, returned in December complaining of persistent pain; she was treated for cellulitis of the left knee and post-surgical infection. []   [McWhorter] reported stiffness and discomfort in May 2015 but had no follow-up with physical therapy due to illness and immobility that her attending physician thought contributed to her stiffness. []

(Tr. 24) (internal citations omitted).  The ALJ cited an Assessment and Treatment Plan from Beaumont Orthopedic Center which related McWhorter's knee pain and leg stiffness to her immobility for an extended period of time.  (Tr. 784).  McWhorter was given a script for physical therapy and instructed to work to improve her range of motion and strength.  (*Id.*).  Additionally, multiple medical records state she had "no pedal edema" (Tr. 868, 638, 644), "No edema," (Tr. 671, 808), and "Edema—resolved" (Tr. 1239).  McWhorter does not identify a single medical record concerning her edema in which a doctor recommended a lack of exercise, sitting, or standing, or feet elevation above the heart for many hours per day, as Dr. Johnstone opined. (*E.g.*, Tr. 868, 784, 786, 897-99 ).[3]

> iii.    *Compartment Syndrome*

The ALJ noted that McWhorter sought treatment for compartment syndrome on September 25, 2015—two days after she presented to the emergency department because a TV fell on her foot.  (Tr. 23-24).  The ALJ then mentioned she returned to the hospital after she "tripped over a wire" the following month.  (Tr. 24).  An X-ray taken during that hospital visit

---

[3] Dr. Malitha Hettiarachchi's discharge summary from a July 2015 hospital visit states that McWhorter was "instructed that weight loss may help" with her chronic pain.  (Tr. 857).  There was no indication that Dr. Hettiarachchi suggested limited physical movement due to any impairment; the opposite is implied.  Other records recommend "exercise on a regular basis" (Tr. 691), or reference excessive weight and lack of exercise as contributors to hypertension (Tr. 1458-59).

showed improvement in soft tissue swelling.  (*Id.*).  These records indicate that outside isolated trauma exacerbated McWhorter's condition, which lends support to the ALJ's determination.

Additionally, the ALJ cited a record from a hospital visit concerning knee and leg pain that instructed McWhorter about rehabilitative exercises. (Tr. 567). The discharge summary noted that she may need to elevate her leg and cool with ice in the short-term, but further instructions emphasized the importance of rehabilitation exercises: "Rehabilitation of the knee is very important following a knee injury or an operation.  After just a few days of immobilization, the muscles of the thigh which control the knee become weakened and shrink (atrophy)… Using an exercycle or bicycle and walking are very helpful in restoring strength and endurance to the leg.  A rehabilitation program following serious knee injuries can speed recovery and prevent reinjury in the future due to weakened muscles."  (*Id.*).  The instructions mentioned more than once that exercises are most effective under the guidance of a physical therapist.  (*Id.*).  These exercise instructions conflict with Dr. Johnstone's opinions, and provide further support for the ALJ's decision not to give them controlling weight.

### iv.  *Degenerative Disc Disease*

The ALJ also analyzed McWhorter's degenerative disc disease, highlighting numerous instances in which the medical records revealed inconsistencies about the extent of McWhorter's alleged symptoms.  (Tr. 23).  The pattern of McWhorter experiencing pain after moving furniture or falling indicates that an external impetus, rather than solely the internal disc disease, often causes her back pain.  The ALJ first noted that McWhorter presented to the emergency department complaining of back pain in both March and July of 2013; but, she reported that she had just been lifting heavy furniture down the stairs.  (*Id.*).  During the second hospital visit, as the ALJ explained, she had a normal range of motion in her back, normal neurological function

and reflexes in her back, and her coordination and gait were normal.  (*Id.*).  The ALJ then cited two subsequent hospital visits in July and August 2013 during which McWhorter showed no difficulty ambulating, and denied back or joint pain.  (*Id.*).  A hospital visit in September 2014, in which McWhorter denied any back pain, showed she had a full range of motion in her upper and lower extremities with normal muscle tone.  (*Id.*).  CT imaging "demonstrated no evidence of lumbar spine injury."  (*Id.*).  Next, the ALJ cited medical findings from a hospital visit after McWhorter experienced a fall and suffered from back pain: "CT imaging demonstrated no evidence of lumbar spine injury but did show degenerative facet arthropathy in the lumbar spine most advanced at L4-5 and L5-S1."  (Tr. 23).  Earlier in that same paragraph, this record states: "PT/OT was consulted to evaluate and treat the patient with recommendations for PT/OT at home."  (Tr. 862).  No records indicate McWhorter ever followed up with PT/OT; nor did she testify at the hearing that she had followed up with PT/OT at home.

Finally, the ALJ noted the attending physician's advice when McWhorter returned to the hospital again in June 2015 due to back pain (Tr. 23): he "advised her that the emergency department was not the place to manage chronic pain and informed her that she would not receive further narcotics for this issue."  (Tr. 890).  While this record also indicates her back pain was "likely a sequelae of her known disc disease," the attending physician devoted a lengthy paragraph to explaining his concern regarding McWhorter's frequent requests for narcotics.  He noted that she "has been repeatedly asking for narcotics by name.  This prompted her MAPS to be checked, and it reveals that she has filled 6 prescriptions for narcotics in the past month.  And since april [sic] she has filled nearly ten prescriptions, from multiple pharmacies and multiple providers… she will not receive further narcotics for this issue, and she should not continue to seek out narcotic prescriptions from urgent care."  (Tr. 890).

*v.*     *Mental Impairments*

Finally, the ALJ provided a detailed discussion of the evidence she considered in relation to McWhorter's mental limitations.  First, the ALJ gave "great weight" to the September 2013 report of consulting psychologist Nick Boneff, Ph.D.  (Tr. 18).  The ALJ noted that Dr. Boneff personally interviewed McWhorter, and found that McWhorter's symptoms "were managed well with medications."  (Tr. 18-19).  Dr. Boneff's report also indicates that McWhorter "complained of feeling anxious and worried about her heart condition but denied any major psychiatric symptoms with her functioning."  (Tr. 623).  Dr. Boneff therefore concluded, "[s]he is not evidencing any significant cognitive impairments or problems with memory or concentration that would affect her ability to do work related activities or interact with others."  (Tr. 624).

The ALJ analyzed the four functional areas concerning mental disorders: daily living, social functioning, concentration, persistence or pace, and decompensation. (Tr. 19; 20 CFR, Part 404, Subpart P, Appendix 1).  The ALJ found McWhorter had no limitation in activities of daily living and social functioning, noting that she "lives independently in a house with her family," "has no difficulty taking care of her [personal needs]," performs hobbies such as reading, watching television, crossword puzzles, and cooking, spends time talking with friends on the phone daily, and has no problem getting along with family, friends, neighbors and others.  (Tr. 19).  The ALJ found only mild limitation in concentration, persistence, or pace, noting that McWhorter reported being able to pay attention and follow instructions "very well".  (*Id.*; Tr. 185).  The ALJ also noted that Dr. Boneff's report indicates McWhorter displayed no problems with memory or concentration.  (Tr. 19, 624).  McWhorter has experienced no episodes of decompensation.  Accordingly, the ALJ deemed her mental impairments nonsevere.  (Tr. 19). McWhorter does not challenge any of these findings by the ALJ.

All of the foregoing evidence cited by the ALJ constitutes substantial evidence at odds with the extreme limitations imposed by Dr. Johnstone.

   b.  *McWhorter Fails to Point to Any of Dr. Johnstone's Treatment Records that Support the Extreme Functional Limitations He Imposed*

McWhorter does not meaningfully address any of the foregoing evidence.  Instead, she simply asserts that "Dr. Johnstone's limitations were fully consistent with [her] *own assertions* as to the limitations she required, particularly with regard to sitting, standing, walking, and leg elevation (Tr. 70, 180, 185).  Accordingly, plaintiff's testimony should not have been deemed less than fully credible, and the ALJ erred in that regard as well."  (Doc. #16 at 17) (emphasis added).  This argument is flawed in two respects.  First, to the extent it is intended to challenge the ALJ's credibility determination, it is so perfunctory that the Court could easily deem it to have been waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (internal quotations omitted)).

Even if not waived, the ALJ's credibility determination is supported by substantial evidence.  The Sixth Circuit has held that an ALJ is in the best position to observe a witness's demeanor and to make an appropriate evaluation as to her credibility.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  In addition to the above-referenced evidence, the ALJ also noted the following inconsistencies between the record and McWhorter's testimony (and Dr. Johnstone's opinion): in July 2013, when McWhorter presented to the E.R. after "lifting furniture down the stairs for (her) mother," she showed normal range of motion in her back, upper, and lower extremities (Tr. 23, 278); in

May 2014, when she presented to the E.R. with leg abscesses after suspected bug bites, she was able to "move all extremities freely with no lateralizing weakness of the upper or lower extremities" (Tr. 24, 794)[4]; and, McWhorter testified at the administrative hearing that doctors recommend exercise to her.  (Tr. 57).[5]  After citing these records, the ALJ understandably discounted McWhorter's credibility as it related her allegations about the "intensity, persistence and limiting effects of [her] symptoms . . ." (Tr. 22).

Second, McWhorter's reliance on her "own assertions" simply highlights her failure to identify any of Dr. Johnstone's treating records (or any other medical records) that support the extreme functional limitations he imposed.  In her motion, McWhorter only mentions three of Dr. Johnstone's treatment records, but none of them suggested any of the extreme limitations contained in his opinion.  For example, McWhorter states, "[i]n July 2014, Dr. Johnstone noted that plaintiff had 'a lot of chest pain, back pain [and] swelling.'"  (Doc. #16 at 13).  But, this document containing a series of progress notes spanning from July 2014 to January 2015 did not reflect Dr. Johnstone communicating with McWhorter multiple times per week; nor did they reflect any physical limitations due to any of her symptoms or conditions.  She also states, "[i]n April 2015, [she] was seen by Dr. Johnstone, and told him that her ankles would swell up no matter what she did." (*Id.*; Tr. 997).  Yet, the record reflects no instruction that McWhorter keep her legs elevated above her heart for the vast majority of the day.  (Tr. 997).  Finally, McWhorter cites a Consultation Request and Report written by Dr. Johnstone in 2007.  (Doc. #16 at 11; Tr. 942).  This record includes space for Dr. Johnstone to specify "Management Diet Activities

---

[4] The Court also notes that a January 12, 2012 emergency room record indicates that McWhorter was there "after heavy lifting.  She said she lifted a steel table . . ." (Tr. 1021).

[5] On November 28, 2010, McWhorter visited the hospital for back pain caused by a fall.  (Tr. 1597).  She was found to have normal range of motion in her back, and walked with a normal gait.  (1598).  Her breathing and cardiac tests were all normal.  (*Id.*).  Upon being discharged, McWhorter was advised to "keep moving as much as possible."  (*Id.*).

Special" notes, as well as "Recommendations," but nowhere in any section did he indicate any specific recommendations or restrictions concerning her activities.  (Tr. 942).

Upon a thorough review of Dr. Johnstone's treatment records (Tr. 938-1014; Tr. 1238-56), this Court did not find any specific records or notes beyond his 2015 Medical Source Statement confirming that McWhorter needed to elevate her legs above her heart for 90% of the working day, that she was unable to walk, sit, or stand for even 2 hours, or that she suffered angina episodes twice a week, each requiring several hours of rest afterwards.  Dr. Johnstone completed multiple patient history reports, progress notes tracking medical updates, two comprehensive history questionnaires, and notes from multiple examinations and procedures (Tr. 938-1014; Tr. 1238-56).  He frequently updated his progress notes regarding McWhorter.  (*See, e.g.,* Tr. 997, 1246, 1010).  None of his notes reflect the severity of McWhorter's conditions to the extent he detailed in his ultimate opinion.[6]  To the contrary, several of his records include blank sections intended for notes about her "Treatment Plan," "Significant Comments/ Recommendations," and "Management Diet [and] Activities," but Dr. Johnstone did not include any physical limitations or recommendations in these notes.  (Tr. 942, 959, 983).  These spaces were sometimes left entirely blank.  (Tr. 942, 983).

Additionally, records of his "Physical Examination" from July 2014 show "Normal Findings" in the following categories:  1) Musculoskeletal System Extremities: No swelling, no Deformities, no Limitation of Motion, no pain or tenderness, no abnormal curvature; 2) Heart: normal rate, regular rhythm, no ectopic beats, apex beat-normal; 3) Mental Status: normal behavior, mood, language, cognitive function, attention, memory, speech, and orientation."  (Tr.

---

[6] While McWhorter testified at the administrative hearing that Dr. Johnstone instructed her to elevate her legs, this hearsay testimony is uncorroborated by his or other treatment notes, and the ALJ reasonably discounted McWhorter's credibility.  Thus, she did not need to accept this testimony as fact.

982).  Other records showed similar findings.  (*E.g.*, Tr. 957 ("Essentially normal coronary artery anatomy with normal left ventricular systolic and diastolic function"); 980 ("Essentially normal coronary artery anatomy with normal left ventricular systolic and diastolic function and normal right heart pressures"); 988 ("Myocardial perfusion imaging is normal.  Overall left ventricular systolic function was normal without regional wall motion abnormalities.  The left ventricular ejection fraction was 55%").

In sum, the ALJ's finding that Dr. Johnstone's "opinions were not consistent with his treatment records, which do not reflect such severe limitations" (Tr. 24) is supported by substantial evidence in the record, and McWhorter did not identify a single one of Dr. Johnstone's treatment records that contradicts that finding.  Accordingly, for all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that McWhorter's Motion for Summary Judgment **[16]** be **DENIED**, the Commissioner's Motion **[18]** be **GRANTED** and this case be **AFFIRMED**.


Dated: July 23, 2018                              s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                          United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 23, 2018.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager